**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ANNE F. DURKIN,

                              Plaintiff,

            v.

VERIZON NEW YORK, INC.,

                              Defendant.

05 Civ. 957 (SCR) (PED)

**OPINION AND ORDER**
**(AMENDED AS TO DATE OF**
**ORDER)**

---

**STEPHEN C. ROBINSON, United States District Judge:**

Anne F. Durkin ("Plaintiff") filed this suit alleging violations of Title VII of the Civil

Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the New York State Human

Rights Law ("NYSHRL"), N.Y. EXEC. LAW § 290 *et seq.*, because of the "sexually hostile work

environment" and gender discrimination to which several female co-workers at Verizon New

York, Inc. ("Verizon" or "Defendant") allegedly subjected her.  Plaintiff further alleges that

Defendant retaliated against her because she pursued charges with state and federal agencies.

Defendant filed a motion for summary judgment as to all of the claims in the Complaint.  For the

reasons discussed herein, Defendant's motion for summary judgment is GRANTED IN PART

and DENIED IN PART.

I.      **BACKGROUND**

Plaintiff began working for Defendant at its Peekskill office in 1981, and held several

positions during the course of her employment.  *See* Deposition of Anne F. Durkin dated October

19, 2005 and November 10, 2005 ("Durkin Dep.") at 64-66; Def. R. 56.1 Stmt. ¶¶ 1-3.  Effective

July 2000, Plaintiff was accepted into the Next Step Program.  *See* Durkin Dep. at 66, 69-71;

Def. R. 56.1 Stmt. ¶¶ 4, 96; Affidavit of Susana Y. Lopez dated April 12, 2006 ("Lopez Aff.")

¶ 3.  As part of this program, Plaintiff received a title upgrade and a substantial increase in pay. *See* Durkin Dep. at 69; Def. R. 56.1 Stmt. ¶ 4; Lopez Aff. ¶ 5.  Plaintiff, like other program participants, was required to attend classes at a participating college one day per week; her tuition and fees were covered by Verizon, and she was paid her salary for the days that she attended class.  *See* Def. R. 56.1 Stmt. ¶¶ 5-6; Lopez Aff. ¶ 6.  Plaintiff was assigned to Defendant's New Rochelle office in connection with the Next Step Program, where she worked as a Central Office Technician from July 2000 until October 18, 2001.  *See* Durkin Dep. at 70-71; Def. R. 56.1 Stmt. ¶ 11.

Beginning in late 2000, Plaintiff was subjected to what she calls sexually offensive behavior by female co-workers in the New Rochelle office, principally by Valerie Vaccaro ("Vaccaro"), Natalie McKenna ("McKenna"), and Donna Markham ("Markham").  *See* Compl. ¶ 13; Durkin Dep. at 88-89.  For example, Plaintiff was told that Vaccaro, McKenna, and Markham spread rumors that Plaintiff did not wear underwear and that she was "loose," and that they were referring to her as "Trailer Park Anny."  *See* Durkin Dep. at 89-90.  Plaintiff confronted the women about the comments, and reported them to her then-supervisor Colin Williams ("Williams").  *See* Durkin Dep. at 93-95.  A short time later, Vaccaro allegedly pulled open Plaintiff's shirt, exposing Plaintiff's camisole, bra, and breasts.  *See* Durkin Dep. at 95-98. Vaccaro told a male co-worker to "look at the set on this one," to which the male co-worker allegedly replied, "Valerie, you are just jealous because she's bigger than yours [sic]."  *See* Durkin Dep. at 97-98.  Plaintiff again complained to Williams and asked to be transferred to another work location.  *See* Durkin Dep. at 99-100.  Plaintiff claims that Williams informed her that he had conferred with his supervisor, Mary Ann Sniffen ("Sniffen"), and they had

determined that Plaintiff's only options were to return to her former, inferior job title at a location in Peekskill, or to remain in New Rochelle. *See* Durkin Dep. at 102-03.

On October 27, 2000, Plaintiff complained about these incidents to Defendant's Equal Employment Office ("EEO") and eventually spoke to Homer Mosley ("Mosley"), who said that he would investigate and that the incidents would stop. *See* Durkin Dep. at 105-10; Def. R. 56.1 Stmt. ¶ 28; Affidavit of Antoinette G. McDermott dated April 13, 2006 ("McDermott Aff.") ¶ 6. Subsequently, Vaccaro and McKenna continued to make comments about Plaintiff's breasts (*i.e.* "Did you have breast surgery," "Are those your real boobs," etc.), asked to see her breasts, and told her to "[t]ake off the miracle bra." *See* Durkin Dep. at 46, 113-14; McDermott Aff. ¶ 6, Ex. B. Vaccaro also allegedly repeatedly said that "you have to have breasts in order to get anything in this company," that "[w]ithout breasts you go nowhere in Verizon," and that Plaintiff "was given all the best jobs" and received "special treatment" because of her breasts. *See* Durkin Dep. at 112, 137. Plaintiff contacted Mosley periodically to inform him about these comments. *See* Durkin Dep. at 112-13. Eventually, Mosley informed Plaintiff that his investigation had uncovered no proof of gender discrimination. *See* Durkin Dep. at 115; Def. R. 56.1 Stmt. ¶ 35; McDermott Aff. ¶ 8. Mosley nevertheless instructed Williams to speak to Vaccaro, McKenna, and Markham about their behavior, which Williams did on November 6, 2000. *See* Def. R. 56.1 Stmt. ¶¶ 36-37, 40; McDermott Aff. ¶¶ 8-10, Exs. C, D. Vaccaro and McKenna denied making any inappropriate comments. *See* Def. R. 56.1 Stmt. ¶ 38; McDermott Aff. ¶ 9.

Plaintiff, unsatisfied with this resolution, contacted Mosley's supervisor, Tom Remeika ("Remeika"). *See* Durkin Dep. at 115-18. Remeika told Plaintiff that he would look into her complaint further, but ultimately concluded that there had been no unlawful discriminatory behavior. *See* Durkin Dep. at 118-19; Def. R. 56.1 Stmt. ¶ 49; McDermott Aff. ¶ 12. In May

and June 2001, Plaintiff contacted another internal EEO case manager, Kathy Bowman ("Bowman"), who, like Remeika and Mosley, determined that there had been no unlawful discriminatory behavior against Plaintiff.  *See* Durkin Dep. at 142; McDermott Aff. ¶ 13.

Plaintiff contends that in response to her EEO complaint, Vaccaro wrote "don't sexually harass Anny" on the wall at their workplace, co-workers threw Plaintiff's tools and other belongings in the garbage, Plaintiff was not given personal phone messages or mail, and Plaintiff was deliberately locked out of the building on one occasion.  *See* Compl. ¶ 22; Durkin Dep. at 119-20, 122-23, 128, 140-41; Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl. Memo. of Law") at 7.  In addition, Plaintiff alleges that whenever she would assist a male co-worker, Vaccaro or McKenna would make kissing and/or lovemaking sounds over the office intercom.  *See* McDermott Aff. ¶ 22, Ex. H.  During one incident when Plaintiff was working with a male employee, McKenna and Vacarro yelled "look who he goes to, he goes to her because she has tits, look at this shit."  *See* Durkin Dep. at 137.

Plaintiff reported these incidents to her then-supervisor Lou Mango ("Mango").  *See* Durkin Dep. at 44, 121-22.  Plaintiff claims that the women made comments about Plaintiff's breasts on a daily basis and that she had more than one hundred conversations with Mango about this pattern of harassment.  *See* Durkin Dep. at 52-53; 155; Pl. Memo. of Law at 7 (citing Durkin Dep. at 27-28).  Apparently, when Mango attempted to assist Plaintiff, Vaccaro and McKenna, along with another female employee who harassed Plaintiff, Lydia Roberts ("Roberts"), acted out against him.  The women hung a voodoo doll of Mango and beat it with sticks when he walked into the room.  *See* Durkin Dep. at 44, 389; Def. R. 56.1 Stmt. ¶ 90.  On one occasion, they chased Mango, and Roberts screamed at and pushed him.  *See* Durkin Dep. at 388-89.

In October 2001, Vaccaro and another female employee, Sue McLynn, came to work with their bras stuffed and wearing name tags with the name "Anne," claiming that they were dressing up as Plaintiff for Halloween.  *See* Durkin Dep. at 43-44, 146-48.  A male co-worker took photos of these women in sexual poses.  *See* Durkin Dep. at 44, 147-48.  Plaintiff complained about this incident to her then-supervisors Kareem Clark ("Clark") and Peter Lundahl ("Lundahl"), who encouraged Plaintiff to confront the women.  *See* Durkin Dep. at 44, 49, 155.  When Plaintiff did so, she found the women wearing their bras and underwear, as well as one male employee wearing his underwear, on the outside of their clothing; she went to get Lundahl and told them explicitly that she found their conduct offensive.  *See* Durkin Dep. at 35-36, 43-44, 155; Def. R. 56.1 Stmt. ¶¶ 59-60; McDermott Aff. at 15, Ex. F.  Several people, including the male co-worker, told Plaintiff that they did not care and that they wanted her to leave Defendant's employ.  *See* Durkin Dep. 155-56.  Lundahl and Clark instructed Plaintiff's co-workers to stop behaving this way, but the taunts and confrontations continued.  *See* Durkin Dep. at 156-57; R. 56.1 Stmt. ¶ 63; Deposition of Peter Lundahl dated December 15, 2005 ("Lundahl Dep.") at 42; McDermott Aff. ¶ 15, Ex. F.

Clark and Lundahl and second-level supervisor Sean O' Connor ("O' Connor") advised Plaintiff to contact EEO officer Toni McDermott ("McDermott"), which she did.  *See* Durkin Dep. at 33-34, 156-57, 163-64; Def. R. 56.1 Stmt. ¶¶ 67-68; Lundahl Dep. at 44-46; McDermott Aff. at 15-17, Exs. F, G.

As a result of these incidents, Plaintiff took a leave of absence on October 18, 2001.  *See* Def. R. 56.1 Stmt. ¶ 74; McDermott Aff. ¶ 19.  At that time, she was told that she could not continue with her Next Step Program schooling while on leave, and therefore withdrew from the educational component of the program.  *See* Durkin Dep. at 246; Def. R. 56.1 Stmt. ¶ 98.

Defendant offered to transfer Plaintiff to certain other offices, but she did not accept those offers. *See* Durkin Dep. at 166, 176-78; Def. R. 56.1 Stmt. ¶ 73; McDermott Aff. ¶ 19.  On November 5, 2001, Plaintiff sent a letter to Defendant in which she explained that she believed her co-workers disliked her because, among other things, she worked more overtime than they did, she worked on the third floor by herself, and she was going to school as part of the Next Step Program.  *See* Def. R. 56.1 Stmt. ¶ 76; McDermott Aff. ¶ 20, Ex. H.  McDermott conducted an investigation while Plaintiff was on leave, and she also reached the conclusion that Plaintiff had not been subjected to unlawful harassment.  *See* Def. R. 56.1 Stmt. ¶¶ 79, 82; McDermott Aff. ¶ 23.

On January 15, 2002, Plaintiff filed a complaint with the New York State Division of Human Rights ("NSDHR"), alleging gender discrimination.  *See* Compl., Ex. 1.  On March 19, 2004, the NYSDHR found probable cause to believe that Defendant engaged in an unlawful discriminatory practice.[1]  *See* Compl., Ex. 2.

Plaintiff returned to work in June 2002, and was transferred to Defendant's Poughkeepsie office.  *See* Compl. ¶ 30; Def. R. 56.1 Stmt. ¶¶ 13, 84; McDermott Aff. ¶ 24.  At her new position, however, she did not receive the type of training she had been receiving in New Rochelle, and made numerous complaints to her supervisors.  *See* Durkin Dep. at 219-21, 226-27.  In August 2002, Plaintiff resumed taking classes as part of the Next Step Program and attended school for one academic year.  *See* Durkin Dep. at 213-14; Def. R. 56.1 Stmt. ¶¶ 99-100; Lopez Aff. ¶ 11.  Plaintiff requested a leave of absence from school for the 2003-2004 academic year, which Defendant granted.  *See* Durkin Dep. at 244, 252; Def. R. 56.1 Stmt.

---

[1] According to the Complaint, Plaintiff's state complaint was "dual filed" with the EEOC on November 15, 2001.  *See* Compl. ¶¶ 4, 6, Ex 1.  On January 10, 2005, the EEOC issued a right to sue letter relating to the November 15, 2001 complaint.  *See* Compl. ¶ 6, Ex 3.  In September 2004, Plaintiff filed a complaint for retaliation with the EEOC, but the EEOC declined to issue a right to sue letter on that complaint.  *See* Compl. ¶¶ 7-8, Ex. 4.  Plaintiff argues that this Court has jurisdiction over the retaliation claim because it represents retaliation for the filing of her first EEOC complaint.  *See* Compl. ¶ 8.

¶¶ 101, 103; Lopez Aff. ¶ 11.  Defendant maintains that Plaintiff was told at that point that no additional leaves from school could be granted.  *See* Def. R. 56.1 Stmt. ¶ 103; Lopez Aff. ¶ 11; Deposition of Arlene Gritmon dated December 14, 2005 ("Gritmon Deposition") at 23.  The Next Step Program handbook does not specify that there is a particular limit on the number of permissible leaves of absence. *See* Gritmon Dep. at 25-26, 28.

As the 2004-2005 academic year was about to begin, Plaintiff again requested a leave of absence.  *See* Durkin Dep. at 267; Def. R. 56.1 Stmt. ¶ 104.  Plaintiff claims she was told that she could receive an extension if she presented a doctor's note, which she did.  *See* Durkin Dep. at 279-80, 292-94.  At that point, Plaintiff was advised that if she did not resume the educational component, she would have to withdraw from the Next Step Program.  *See* Def. R. 56.1 Stmt. ¶ 106; Lopez Aff. ¶¶ 11-12.  Plaintiff was further informed that the consequence of withdrawing from the program, as specified in the program handbook, would be a return to her prior job title and location in Peekskill.  *See* Durkin Dep. at 282-84; Def. R. 56.1 Stmt. ¶ 14; Lopez Aff. ¶ 12. Plaintiff was particularly alarmed about a transfer back to Peekskill, she says, because McLynn occasionally works out of that office.  *See* Durkin Dep. at 286-87.

Beginning on September 2, 2004, Plaintiff took a paid psychiatric leave of absence from Verizon.  *See* Def. R. 56.1 Stmt. ¶¶ 110-11; Lopez Aff. ¶ 13; Affidavit of Joan A. Scott-Monck dated April 12, 2006 ("Scott-Monck Aff.") ¶ 4.  Because of the timing of her leave, she was never actually returned to her previous title and location in Peekskill.  *See id.*  On September 8, 2005, Plaintiff exhausted her paid leave benefits and was removed from the Verizon payroll.  *See* Def. R. 56.1 Stmt. ¶¶ 16-17; Scott-Monck Aff. ¶ 4, Ex. B.

## II.     DISCUSSION

### A.     Standard of Review

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The moving party bears the burden of demonstrating that no genuine issue as to any material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A court considering a motion for summary judgment must construe the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor. *See Anderson*, 477 U.S. at 255. Rather than asking if "the evidence unmistakably favors one side or the other," a court must ask "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.* at 252. If so, the court may not grant a defendant's motion for summary judgment. *See id.* Assessing the credibility of witnesses and choosing between conflicting versions of events are roles for the fact finder, not for the court on summary judgment. *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).

The non-moving party must present sufficient evidence such that a jury could reasonably find in its favor. "[T]he mere existence of a scintilla of evidence in support of the plaintiff's position" is not enough. *Anderson*, 477 U.S. at 252. "The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing

that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).

### B.    Hostile Work Environment

#### i.    Overview

Title VII of the Civil Rights Act of 1964 prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  The Supreme Court has made clear that the provisions of Title VII that prohibit sex-based discrimination extend to sexual harassment.[2]  *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 63-68 (1986).  Sexual harassment has been defined to include "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature."  *Id.* at 65 (quoting 29 C.F.R. § 1604.11(a)) (alteration in original).  To prevail on a claim of sexual harassment based on a hostile work environment, a plaintiff must establish: "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his or] her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer."  *Petrosino v. Bell Atl.*, 385 F.3d 210, 221 (2d Cir. 2004) (alteration in original; quotations omitted).  The sufficiency of a hostile work environment claim is subject to both objective and subjective components.  *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993).  Objectively, the conduct must create "an environment that a reasonable person would

---

[2] It is well established that the analysis of claims made under the NYSHRL "parallels the analysis used in Title VII claims."  *Mack v. Otis Elevator Co.*, 326 F.3d 116, 122 n. 2 (2d Cir. 2003).  Accordingly, this Court need not separately analyze the state law claims.

find hostile or abusive." *Id.* at 21.  The subjective component requires that the plaintiff herself perceive the work environment to be hostile or abusive.  *See id.* at 21-22.

In analyzing these claims, courts must consider the totality of the circumstances.  *See Harris*, 510 U.S. at 23.  Among the factors considered by courts are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance." *Id.*  "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quotations omitted).  The appropriate test is whether the "harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." *Torres v. Pisano*, 116 F.3d 625, 632 (2d Cir. 1997) (citing *Harris*, 510 U.S. at 21).  The Second Circuit has cautioned that while the standard for establishing a hostile work environment is high, the bar must not be set too high: "the environment need not be 'unendurable' or 'intolerable,'" and employers can be subject to liability in more than just "the most egregious cases." *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004).

This Court has no hesitation finding that the acts against Plaintiff, as alleged and viewed in their totality, were sufficiently pervasive, severe, and frequent that a reasonable jury could find that Plaintiff's workplace was altered for the worse.  The evidence supports such a finding on both the objective and subjective prongs.  Objectively, a reasonable person could find that the often daily comments and physical conduct—including the incident in which a co-worker tore open Plaintiff's shirt and exposed her breasts—that spanned more than a year created a hostile environment.  Subjectively, there is no question that Plaintiff found the environment to be

hostile.  In Plaintiff's own words, she felt like she "was in prison" and spent each day just trying to "make it to the end of the day."  *See* Durkin Dep. at 37-38.  When Plaintiff went on leave in October 2001, leaving in the middle of the work day, she did so because "mentally [she] couldn't take no more."  *See* Durkin Dep. at 164-65.  She then spent the following year on leave, feeling "totally exhausted" and psychologically unable to return to work.  *See* Durkin Dep. at 165-67. Accordingly, summary judgment on this basis is not warranted.

### ii.      Harassment by Co-workers of the Same Gender

When a plaintiff alleges a hostile work environment based on sexual harassment, "nothing in Title VII necessarily bars a claim of discrimination 'because of . . . sex' merely because the plaintiff and the defendant (or the person charged with acting on behalf of the defendant) are of the same sex."  *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 79 (1998). The Supreme Court was also careful to note, however, that workplace harassment does not automatically constitute discrimination "merely because the words used have sexual content or connotations."  *Id.* at 80.  The critical inquiry is "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."  *Harris*, 510 U.S. at 25 (Ginsburg, J., concurring).

The unanimous *Oncale* Court described three evidentiary routes by which a plaintiff could establish a clear inference of discrimination in a same-sex harassment suit: (1) "if there were credible evidence that the harasser was homosexual"; (2) "if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace"; or (3) "direct comparative evidence about how the alleged harasser treated members of both sexes in a

mixed-sex workplace."[3]  523 U.S. at 80-81.  The Court also emphasized that "[w]hatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimin[ation] . . . because of . . . sex.'"  *Id.* at 81 (emphasis omitted).

      Here, Plaintiff alleges that the conduct at issue falls within the third *Oncale* category.  To establish "direct comparative evidence about how the alleged harasser treated members of both sexes," Plaintiff must demonstrate that women as a group were treated differently than men as a group.  The bulk of the conduct against Plaintiff targeted her breast size—for instance, comments such as "look at the set on this one" and repeated statements that Plaintiff only received certain work opportunities because of her large breasts.[4]  There is no evidence that any of Plaintiff's male co-workers were similarly harassed with comments and/or conduct regarding their breasts or breast size.  The only evidence offered regarding treatment of men involves the negative treatment of one of Plaintiff's supervisors, Mango.  The very same women who harassed Plaintiff also targeted Mango, though they did so in a manifestly different way.[5]  The antagonists hung a voodoo doll of Mango and beat it with sticks whenever he entered the room.  One woman also screamed at and pushed Mango.  But no evidence suggests that any comments were made about or behavior was targeted at Mango's breasts.  *See* Oral Argument Transcript dated April

---

[3] Nothing in *Oncale* suggests that these routes are the only ones under which same-sex harassment claims may be brought.  *See E.E.O.C. v. Grief Brothers Corp.*, No. 02 Civ. 468S, 2004 WL 2202641, at * 12 (W.D.N.Y. Sept. 30, 2004).  Courts in this Circuit have also permitted claims where a plaintiff alleges that harassment was based on sexual stereotypes that constitute sex-based discrimination under *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).  *See id.* at *12-14.  Plaintiff has not alleged that the conduct at issue was based on sexual stereotypes, and therefore, this Court does not evaluate Plaintiff's claims under that framework.

[4] Plaintiff also complained of a variety of behavior by her antagonists that did not involve her breasts.  Some of those behaviors were stereotypically gender-specific, such as the antagonists calling her "loose" and spreading rumors that she did not wear underwear.  Other behaviors were unrelated to gender, for example, the antagonists throwing Plaintiff's tools and personal belongings into the garbage and locking her out of the workplace.  Nevertheless, it is undisputed that conduct involving Plaintiff's breasts constituted the majority of the behavior at issue.  *See* Oral Arg. Tr. at 36.

[5] Defendant claims that the antagonists "similarly mistreated" Mango.  *See* Def. Memo. of Law at 13.  This Court cannot agree that anything about the antagonists' treatment of Mango and Plaintiff was similar.

30, 2007 ("Oral Arg. Tr.") at 31.  Nor would this Court expect otherwise.  Cultural norms dictate that men typically are not harassed with behaviors targeted at their breasts.  The comparative treatment of Mango, along with that of men in society generally, provides a sufficient basis from which a jury could find that men as a group were treated differently than women as a group.

At least one circuit has further required evidence that more than one member of the plaintiff's gender was harassed.  *See Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1125 (D.C. Cir. 2002) ("While [the plaintiff] correctly notes that courts do not always require Title VII plaintiffs to show that their harasser targeted multiple members of the plaintiff's sex, such a showing *is* required where, as here, the plaintiff proceeds under the third *Oncale* method and claims that the harassers treated men as a group differently than women as a group.").  In *Davis*, the plaintiff alleged that his male harassers directed lewd gestures and comments at him, but not at any female employees, thus systematically treating men differently than women.  *Id.* at 1124. Emphasizing that the third *Oncale* category requires evidence "about how the alleged harasser treated *members* of both sexes," the D.C. Circuit rejected the plaintiff's argument, finding that he had established not that the harassers treated men differently than women, but only that they treated the plaintiff differently than all other employees.  *Id.*  The plaintiff's evidence instead suggested that the harassers targeted the plaintiff as an individual, rather than because of his sex. *Id.*  The D.C. Circuit noted that, absent evidence about the treatment of multiple members of the plaintiff's gender, any adverse treatment in the workplace against a particular individual could be converted into a claim of discrimination, contravening the purpose of Title VII.  *Id.* ("[S]uch a theory would convert the statute from a law aimed at eradicating discrimination to one that prescribes a 'general civility code for the American workplace.'" (quoting *Oncale*, 523 U.S. at 80)).

This Court disagrees that a plaintiff must offer evidence regarding treatment of other members of her gender to satisfy the third *Oncale* category.  The burden on the plaintiff to demonstrate that the harassment is "because of sex" is enough to ensure that Title VII does not become a "general civility code."  Accordingly, this Court finds that Plaintiff's failure to offer evidence regarding treatment of other women does not itself warrant dismissal of her claims.

Having found "direct comparative evidence" that the sexes were treated differently, this Court still must determine whether the conduct at issue constituted discrimination "because of sex."  Defendant relies upon *Brown v. Henderson*, F.3d 246 (2d Cir. 2001), to argue that the conduct at issue does not constitute discrimination "because of sex."[6]  In *Brown*, the Second Circuit affirmed the district court's entry of summary judgment that a female employee had not been subjected to harassment "because of sex," holding that sexual content and connotation alone is not enough to constitute a Title VII violation.  *Id.*  The plaintiff there claimed that she was subjected to sex-based harassment that originated in a union-related dispute and a purported affair between the plaintiff and a married co-worker.  *Id.* at 249.  The plaintiff complained of a variety of conduct, of which three incidents were graphically sexual: (1) a picture of a naked, obese woman performing a lewd act with a caption referencing the alleged affair between the plaintiff and the co-worker was posted near the co-worker's route; (2) a picture showing two elephants mating with a caption with plaintiff's and the co-worker's names was posted in the same spot near the co-worker's route; and (3) a sexually explicit cartoon of plaintiff was drawn

---

[6] Plaintiff, in contrast, relies upon *Petrosino v. Bell Atlantic*, 385 F.3d 210 (2d Cir. 2004).  *See* Oral Arg. Tr. at 23. This Court finds that case inapposite.  In *Petrosino*, the question was whether the common exposure of men and women to certain offensive behaviors constituted sex-based discrimination.  The court found that, although a work environment that is equally harsh for both men and women cannot support a claim of sex discrimination, under the circumstances of the case, a reasonable person could "consider the sexually offensive comments and graffiti . . . at issue more offensive to women than to men and, therefore, discriminatory based on sex."  *Id.* at 222.  Here, the question is not whether the conduct at issue is more offensive to women than to men, but whether conduct targeted at a particular type of women—*i.e.* those distinguished based on breast size—can constitute sex-based discrimination.

in the men's bathroom.  *Id.* at 250.  The court found that the overwhelming evidence indicated that the hostility toward the plaintiff was grounded in workplace dynamics unrelated to her sex, namely the union-related dispute and the purported affair.  *Id.* at 255-56.  Among the evidence upon which the court relied was the plaintiff's own allegations that the antagonists' hostility was motivated by factors other than her gender and the fact that plaintiff did not allege that the discrimination was gender-based until the summary judgment phase.  *Id.* at 255-56.  The court concluded that the only basis for linking the harassers' conduct to the plaintiff's sex was the fact that the conduct at issue included a cartoon and pictures that "relied for their effect upon a depiction of a naked female body."  *Id.* at 255-56.  In reaching this conclusion, however, the court cautioned that there was no evidence that the union-related dispute was "itself rooted in or exacerbated by [the plaintiff's ] gender."  *Id.* at 256 n.3.  Such circumstances are readily distinguishable from those now before this Court.

The conduct at issue suggests not that the antagonists disliked Plaintiff and consequently chose to harass her in terms of her breast size, but rather that the antagonists disliked Plaintiff and harassed her *because* of her breast size.  In other words, unlike in *Brown*, it is not the case here that the sole basis for the claims is that the harassment was occasionally manifested in ways that had sexual content and connotation.  Both Plaintiff and Defendant here have offered a variety of different possible motives for the offensive behavior against Plaintiff, including that the antagonists were jealous of Plaintiff's appearance, that she received more overtime than they did, and that she participated in the Next Step Program, as well as that the antagonists disliked her because she worked on the third floor by herself.[7]  *See* Durkin Dep. at 187, 189-90; McDermott Aff. ¶ 20, Ex. H.  Defendant asserts that while these motives might establish

---

[7] Plaintiff has also alleged that she does not know the reason for the harassment, and that some of these explanations were provided to her by others.  *See* Durkin Dep. at 186-87, 189-90.

personal animosity against Plaintiff, none of them would establish that the harassment was "because of sex." *See* Defendant's Memorandum of Law in Support of Motion for Summary Judgment ("Def. Memo. of Law") at 1; Oral Arg. Tr. at 14, 19-20, 33. This Court disagrees. The conduct that Plaintiff has alleged provides a sufficient basis from which a jury could infer that the antagonists' motive derived from Plaintiff having comparatively larger breasts than her co-workers. That is, a jury could find that the antagonists' motive was "rooted in" their feelings about Plaintiff's breast size, the exact situation that the *Brown* court distinguished. A jury, for instance, could find that the antagonists were jealous of Plaintiff because of her breasts, that they believed she got more overtime work than they did because of her breasts, and/or that she was permitted to participate in the Next Step Program because of her breasts. If a jury, in fact, does conclude that the antagonists' underlying motive related to Plaintiff's breast size, this Court holds that such a motive would be "because of sex."

The significance of breasts with respect to gender identity is unique to women, especially regarding breast size. In a professional workplace, breasts are the most obvious and easily observable representation of gender. That Plaintiff was treated differently because of her breasts, a distinctively female gender characteristic, establishes that such treatment was "because of sex."

### iii.    Verizon's Vicarious Liability

The standards for imputing liability to an employer differ under Title VII and the NYSHRL. Under Title VII, where an employee is the victim of sexual harassment by non-supervisory co-workers, an employer's vicarious liability depends on the plaintiff showing that the employer knew—or reasonably should have known—about the harassment but failed to take appropriate remedial action. *See Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000). Under the NYSHRL, however, an "employer cannot be held liable . . . for an employee's

discriminatory act unless the employer became a party to it by encouraging, condoning, or approving it." *Pasqualini v. MortgageIT, Inc.*, No. 05 Civ. 9714, 2009 WL 2407651, at *11 (S.D.N.Y. Aug. 5, 2009).

Defendant here maintained stated policies against discrimination and harassment, and provided means by which employees could complain of alleged violations. *See* McDermott Aff. ¶ 4. These facts alone, however, are not necessarily dispositive. *See Petrosino*, 385 F.3d at 226. Plaintiff complained of the alleged harassment to all of her various supervisors, three EEO investigators, and those investigators' supervisor. Defendant asserts that it responded appropriately to these complaints. According to Defendant, each of Plaintiff's claims was investigated, her antagonists repeatedly were told that their behavior was improper, Plaintiff was offered other job placements, and additional sensitivity trainings were conducted in the New Rochelle office. *See* Durkin Dep. at 36-37; McDermott Aff. ¶ 22, Ex. H. That said, Defendant's actions never resulted in any direct disciplinary action against the offending co-workers, nor did they actually lead to termination of the offending behavior. Additionally, Defendant's first response to Plaintiff's complaints was to suggest a transfer that would have amounted to a demotion.

The record in this case is insufficient to warrant summary judgment for Defendant on the Title VII claim. There is no dispute that various supervisory employees knew of Plaintiff's complaints. While these employees allegedly took steps to remedy the harassment, the question of whether these measures constitute the type of appropriate action required under Title VII is one properly resolved by a jury. Summary judgment is warranted, however, on the NYSHRL claim. There is no evidence that Defendant encouraged or approved of the antagonists' conduct. To the contrary, Defendant investigated each of Plaintiff's claims and made repeated efforts to

end the harassment.  Though Defendant's attempts ultimately were unsuccessful, the efforts

nonetheless defeat any argument that Defendant condoned the antagonists' behavior.  *See*

*Pasqualini*, 2009 WL 2407651, at *11 ("An employer can disprove . . . condonation by a

showing that the employer reasonably investigated a complaint of discriminatory conduct and

took corrective action." (quotations omitted)).  Accordingly, Plaintiff's hostile work environment

claim under the NYSHRL is dismissed.

### C.    Retaliation by Verizon

#### i.    Overview

Allegations of retaliation are considered under the burden-shifting framework laid out in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *See Sumner v. United States*

*Postal Serv.*, 899 F.2d 203, 208 (2d Cir. 1990).  The plaintiff bears the minimal initial burden of

establishing a prima facie case of discrimination through direct or circumstantial evidence.  *See*

*Windham v. Time Warner, Inc.*, 275 F.3d 179, 187 (2d Cir. 2001).  A plaintiff who is able to

make out a prima facie case creates a presumption of discrimination and shifts the burden of

production to the defendant.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142

(2000).  The defendant must meet this burden by articulating a legitimate, nondiscriminatory

reason for the adverse employment action.  *See id.*  If the defendant can present a

nondiscriminatory explanation, the presumption of discrimination drops out of the analysis and

the burden of proof shifts back to the plaintiff.  *See id.* at 142-43.  The plaintiff must then prove

"that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext

for discrimination."  *Id.* at 143.  To defeat summary judgment, "the plaintiff's admissible

evidence must show circumstances that would be sufficient to permit a rational finder of fact to

infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004).

To establish a prima facie case of retaliation, a plaintiff must adduce evidence that "(1) she was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer." *Raniola v. Bratton*, 243 F.3d 610, 624 (2d Cir. 2001).

Although the retaliation claims are not clearly articulated, Plaintiff appears to allege that a variety of Defendant's actions constitute retaliation for filing complaints with the EEO and the NYSDHR, including: (1) the denial of leave from the educational component of the Next Step Program for the 2004-2005 academic year; (2) the threat to demote Plaintiff to her former title and salary if she did not continue with her Next Step Program requirements; (3) "forcing" Plaintiff to take a leave of absence rather than return to Peekskill; and (4) the unfavorable treatment of Plaintiff upon her transfer to the Poughkeepsie Office. *See* Pl. Memo. of Law at 22-24. It is not disputed that Plaintiff filed a charge of discrimination with the EEO and the NYSDHR or that Defendant was aware that Plaintiff had filed the charges. Thus, this Court must determine whether each action constitutes an adverse employment action and, if so, whether it was causally connected to Plaintiff's complaining of the alleged harassment.

An adverse employment action is a "materially adverse" change in working conditions. *Patrolmen's Benevolent Ass'n v. City of New York*, 310 F.3d 43, 51 (2d Cir. 2002). To be materially adverse, a change "must be more disruptive than a mere inconvenience or an alteration of job responsibilities and might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of

benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Id.* (quotations omitted).  The action must be such that "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotations omitted).  The standard is an objective one, and "the significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* at 69.

Once a plaintiff demonstrates that an employment action was adverse, that plaintiff must establish a causal connection between that action and plaintiff's participation in protected activities.  This connection can be established either directly through evidence of retaliatory animus, or indirectly by means of circumstantial evidence, for example, by showing that the protected activity was closely followed in time by the adverse action.  *See Sumner*, 899 F.2d at 209.  To show a causal connection on the basis of temporal proximity, the events in question must have occurred very near in time.  *See Gorman-Bakos v. Cornell Coop. Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001).

> **ii.    Denial of Leave from the Educational Component of the Next Step Program for the 2004-2005 Academic Year**

The denial of leave from the educational component of the Next Step Program for the 2004-2005 academic year constitutes an adverse employment action since it ultimately could have prevented Plaintiff from participating in the Next Step Program, thereby resulting in demotion and loss of salary.  That the denial did not necessarily—or here, ultimately—result in demotion and loss of salary does not undercut that the action is materially adverse.

However, Plaintiff cannot establish the requisite causal connection between her complaints of harassment and the denial of leave.  Defendant granted Plaintiff's request for leave from the educational component of the Next Step Program for the 2003-2004 academic year,

after Plaintiff had already filed complaints with the EEO and the NYSDHR.  Having already granted one such request by Plaintiff subsequent to her engaging in the protected activities, it is difficult to view the denial of the second request as causally connected to Plaintiff's involvement in those activities—especially since Plaintiff did not engage in any additional protected activity between the grant of leave for the 2003-2004 academic year and the denial of leave for the 2004-2005 academic year.

The length of time between the protected activities and the alleged retaliatory action further undermines any causal connection.  Plaintiff filed the EEO complaint on October 27, 2000, and the NYSDHR complaint on January 15, 2002.  Plaintiff was denied leave for the 2004-2005 year at the beginning of that academic year.  The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship" between the protected activity and an allegedly retaliatory action.  *Id.* However, the longer the period of time between the protected activity and the adverse employment action, the greater the likelihood that the defendant will be able to rebut the plaintiff's claim of causation.  *See id.* (collecting cases).  Courts within this district have generally found six months, for example, to be too long to suggest a causal relationship.  *See, e.g.*, *Lichtenstein v. Triarc Cos.*, No. 02 Civ. 2626, 2004 WL 1087263, at *7 (S.D.N.Y. May 14, 2004) ("[W]hile proximity in time between the complaint and the adverse employment action may provide circumstantial evidence of retaliation, a hiatus of six months is generally too great to support the inference.").  *But see Suggs v. Port Auth. of New York & New Jersey*, No. 97 Civ. 4026, 1999 WL 269905, at *6 (S.D.N.Y. May 4, 1999) (six months between filing EEOC complaint and firing was "sufficiently close in time to raise an inference of retaliation").  Here,

substantially more than six months elapsed between the filing of Plaintiff's complaints and the denial of leave.

Given the length of time that elapsed and the lack of any other basis alleged upon which to find that the denial of leave was retaliatory, this Court finds that the denial of leave did not constitute a retaliatory action.

> ### iii.    Threat to Demote Plaintiff to Her Former Title and Salary if She Did Not Continue with Her Next Step Program Requirements

The threat to demote Plaintiff to her former title and salary if she did not continue with the Next Step Program requirements does not itself constitute an adverse employment action. Rather than be demoted and have her salary reduced, Plaintiff instead chose to take a final leave of absence from Verizon.  In this Circuit, an action must actually occur to be considered an adverse employment action.  *See, e.g.*, *Thomas v. Bergdorf Goodman, Inc.*, No. 03 Civ. 3066, 2004 WL 2979960, at *10 (S.D.N.Y. Dec. 22, 2004) ("The mere threat of disciplinary action, including the threat of termination, does not constitute an adverse action materially altering the conditions of employment.").  Because this Court finds that the threat to demote Plaintiff does not constitute an adverse employment action and therefore cannot support Plaintiff's claims of retaliation, this Court need not evaluate whether such action was causally connected to Plaintiff's protected activities.

> ### iv.    Forcing Plaintiff to Take a Leave of Absence Rather than Return to Peekskill

Plaintiff appears to claim, without articulating how, that Defendant "forced" her to take a leave of absence in retaliation for her participation in protected activities.  *See* Pl. Memo. of Law at 22.  This claim seems to be redundant with Plaintiff's claim regarding the denial of leave from the educational component of the Next Step Program for the 2004-2005 academic year, since

that denial placed Plaintiff in the position of deciding whether to continue participating in or to completely withdraw from the Next Step Program.  Rather than selecting from these options, Plaintiff took a psychiatric disability leave from Verizon.  It is difficult to understand how the decision to go on disability leave creates a cause of action distinct from Defendant's actions in denying the requested leave from the Next Step Program.[8]  To the extent this allegation is, in fact, predicated on the denial of leave, this Court finds that this claim likewise does not support a claim of retaliation since no causal connection between the denial and the protected activities has been established.  *See supra* Part II.C.ii.  To the extent Plaintiff alleges some other basis on which she was "forced" to take a leave of absence from Verizon, on the record currently before this Court, such a claim is wholly unsubstantiated.

> **v.   Treatment of Plaintiff Upon Her Transfer to the Poughkeepsie Office**

Plaintiff alleges that when she transferred to the Poughkeepsie office, Defendant engaged in a variety of retaliatory conduct.  She first alleges that Defendant failed to timely provide her with a desk, phone, and computer, as well as with the appropriate training.  Any delay in Defendant providing Plaintiff with a desk, a phone, a computer, and training does not rise to the level of materially adverse required to constitute an adverse employment action.  *See Breland-Starling v. Disney Publ'g Worldwide*, 166 F.Supp.2d 820, 825 (S.D.N.Y. 2001) (failure to receive new computer and certain training "may have been unpleasant for plaintiff, but . . . d[id] not amount to anything close to an adverse employment action").

---

[8] Plaintiff has not alleged a constructive discharge cause of action, nor would the facts support one.  "[A]n employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily."  *Petrosino*, 385 F.3d at 229.  Even assuming *arguendo* that Plaintiff was involuntarily forced to take a leave of absence, Plaintiff's hostile work environment was created by her co-workers, not by Defendant.  Defendant, in fact, repeatedly took steps to remedy the harassment against Plaintiff, including repeatedly speaking with the antagonists and holding an additional sensitivity training.

Plaintiff also appears to claim that Defendant retaliated against her by assigning Plaintiff
to share an office with a co-worker who believed that Plaintiff had not been harassed while in the
New Rochelle office and that Plaintiff's experiences "were of her own making." *See* Pl. Memo.
of Law at 23. Plaintiff offers no further evidence regarding this allegation. Without more, this
Court cannot find that the assignment constitutes an adverse employment action.

Because this Court finds that none of the complained of acts regarding Plaintiff's transfer
to the Poughkeepsie office constitute adverse employment actions, and therefore cannot support
Plaintiff's claims of retaliation, this Court need not evaluate whether these actions were causally
connected to Plaintiff's protected activities.

## III. CONCLUSION

For the reasons discussed above, Defendant's motion for summary judgment is
GRANTED as to the hostile work environment claim under NYSHRL and the retaliation claims
under Title VII and the NYSHRL. The motion is DENIED as to the hostile work environment
claim under Title VII. The Clerk of the Court is directed to terminate docket entry number 11.

IT IS SO ORDERED.

Dated: January 7, 2010
White Plains, New York

Stephen C. Robinson
United States District Judge

24